## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELLIOTT MIRANDA, and<br>ESTRELITA MIRANDA, h/w, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| vs. | : | C.A. No. 2:18-cv-00553-MMB |
| | : | |
| C.H. ROBINSON COMPANY | : | |
| C.H. ROBINSON COMPANY, INC. | : | |
| C.H. ROBINSON INTERNATIONAL, INC. | : | **JURY TRIAL DEMANDED** |
| C.H. ROBINSON WORLDWIDE, INC. | : | |
| ISABELLA SHIPPING CO., LTD. | : | |
| UPALA AGRICOLA, S.A. | : | |
| TRANSPORTES GRANT, S.A., | : | **PLAINTIFFS' FIRST AMENDED** |
| | : | **COMPLAINT** |
| | : | |
| Defendants, | : | |

## PARTIES, FACTS, PROCEDURAL BACKGROUND

**I.    Plaintiffs' First Amended Complaint - Procedural History and Related Matters**

**A. Plaintiffs' First Amended Complaint, Filed Pursuant to Rule 15(a)(1)(B)**

1.    Plaintiffs, Elliot Miranda and Estrelita Miranda, file this First Amended Complaint pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.

2.    Plaintiffs ELLIOT MIRANDA and ESTRELLITA MIRANDA are husband and wife.

3.    Plaintiffs ELLIOT MIRANDA and ESTRELLITA MIRANDA are citizens and, at all relevant times alleged herein, have been residents of the Commonwealth of Pennsylvania, residing therein at 3565 Jannie Street, Philadelphia, Pennsylvania.

4.    On April 13, 2016 and relevant times alleged hrein, Plaintiff ELLIOT MIRANDA was employed by Horizon Stevadoring Company.

5.      Plaintiffs have not previously filed an Amended Complaint.  This is Plaintiffs' First Amended Complaint.

6.      Defendant UPALA AGRICOLA, S.A. ("Upala") is, upon information and belief, a foreign business entity located at Upala de San Carlos De La Entrad Cano Negro 3 KMS Norte Y 3 KMS Este, Cuidad Quesada, AL, Costa Rica.

7.      On June 12, 2019, Defendant Upala Agricola, S.A. ("Upala") identified herein, incorporated by reference, responded to Plaintiffs' Complaint by filing a Federal Rule 12 (b) (2) Motion to Dismiss, alleging a lack of personal jurisdiction.

8.      Defendant Upala's Motion was served upon Plaintiffs, through their counsel, via this Honorable Court's ECF on June 12, 2019.

9.      Defendant TRANSPORTES GRANT, S.A. ("Transportes" and/or "TG") is, upon information and belief, a foreign business with principal place of business located at Apartado Postal: 621-2300 Curridabat Del Deposito Fiscal del BCAC en la Lima, Cartago 500 mts. Sur y 300 oeste, Costa Rica and/or at Calle 70 San Jose Guadalupe, Costa Rica.

10.     As discussed herein and below, incorporated by reference, Defendant Transportes Grant, S.A. ("Transportes" and/or "TG", herein) rented, supplied, and delivered a forty-foot (40') refrigerated container, identified as Container TRIU8053226, which, upon information and belief, Defendant TG delivered to Defendant Upala's farm, as directed by Defendant Upala, its employees, servants, or agents, to Defendant Upala's packing station, a property owned, possessed, and/or controlled by Defendant Upala, on or about April 2, 2016.

11.     Plaintiffs file this Amended Complaint pursuant to Rule 15 (a) (1) (B) within twenty-one (21) days after service of a Motion under Rule 12 (b), by July 3, 2019.

2

12. Plaintiffs' filing of the Amended Complaint moots Defendant Upala's pending Rule 12(b) Motion.

### B.    Defendants CHR, CHRI, ISABELLA, and UPALA

13. Defendant C.H. ROBINSON COMPANY ("CHR") is a foreign business entity with principal place of business located at 14701 Charlson Road, Suite 1400, Eden Prairie, Minnesota, 33025.

14. Defendant CHR has, upon information and belief, conducted business also from the same address above, at Suite 900.

15. Defendant CHR is, upon information and belief, a Delaware Corporation, with principal place of business located above and with offices elsewhere, including at 775 Prairie Center Drive, Eden Prairie, Minnesota.

16. At all relevant times alleged herein, Defendant CHR has been registered to conduct business in the Commonwealth of Pennsylvania.

17. Defendant C.H. ROBINSON COMPANY, INC. ("CHR, Inc.") is, upon information and belief, a Minnesota Corporation, with principal place of business located at 14701 Charlson Road, Eden Prairie, Minnesota, 55347.

18. Defendant CHR, Inc. is, and has been, at relevant times alleged herein, upon information and belief, registered to conduct business in the Commonwealth of Pennsylvania.

19. Defendant ISABELLA SHIPPING CO., LTD. ("Isabella") is a foreign business entity with a principal location at 9999 Ponce de Leon Blvd, Suite 910, Coral Gables, Florida. 33134.

20.    With regard to the facts and matters at issue herein, at all relevant times alleged herein, Defendant Isabella has acted through its agent, Interoceanica Agency, Inc. ("Interoceanica").

**C. Defendants CH Robinson's and Upala's Sale, Shipment, and Import of Pineapples**

21.    It is believed and averred that, on or about April 8, 2016, and, upon information and belief, before this date, based upon an existing course of business dealing between Defendant CHR and/or Defendants C.H. Robinson, identified herein, incorporated by reference, Defendant CHR and/or Defendants C.H. Robinson contracted with Defendant Isabella, through its express agent, Interoceanica, for the shipment of "Fresh Pineapples", packed into 1500 boxes, onto 20 pallets, loaded onto Defendant TG's Container No. TRUI8053226.

22.    It is believed and averred that the above paragraph information is incorporated in and referenced by Defendant Isabella's and/or its agent Interoceanica's invoice no. 4425173 which, in turn, references and/or incorporates Bill of Lading No. 1SBL1PH16147, identified and discussed herein, incorporated by reference.

23.    A true and correct copy of this Bill of Lading is attached hereto as Exhibit "1."

24.    The Bill of Lading number, referenced herein, is interpreted to be as stated, since the copies are not clear.

25.    It is believed and averred that the above agreement for transport and delivery, by sea, identified in Defendant CHR's, Defendants C.H. Robinson's, and by Defendant Isabella's, by its agent Interoceanica's invoice no. 4425173, is part of a continuing agreement, enterprise, import venture for the import of pineapples, established through a venture, partnership, and/or agency between Defendant CHR and/or Defendants C.H. Robinson and/or Defendant Upala, for

4

the United States import and sale of Defendant Upala's pineapples grown and produced in Costa Rica identified and discussed herein.

26.    In the aforementioned Isabella/Interoceanica invoice, it is believed and averred that Defendant CHR and/or Defendants C.H. Robinson, identified herein, incorporated by reference, agreed to transport the subject pineapples, on a ship, identified as the Santa Maria, on voyage 167147, from Moin, Costa Rica to Philadelphia, Pennsylvania.

27.    The averments in Plaintiffs' Amended Complaint assert legal claims, set forth herein, incorporated by reference, that arise out of conduct and transactions set forth in Plaintiffs' original Complaint, which relate to the loading, packing, securing, stowage, palletization, sale, delivery, supply, shipment, and/or import of Defendant Upala's pineapples, packed, loaded, and stowed in Container TRIU8053226 which, upon information and belief, were grown, harvested, processed, packaged, supplied, sold, loaded, palletized, secured, and stowed by Defendant Upala, its employees, servants, and/or agents, by agreement and, as part of Defendant Upala's ongoing venture or enterprise for importing  Defendant Upala's pineapples, which Defendant Upala had with Defendants C.H. Robinson, identified herein, incorporated by reference.

28.    On April 2, 2016, upon information and belief, Defendant TG's rented Container TRIU8053226 was loaded at Defendant Upala's farm or property with approximately 1500 boxes of pineapples and placed pallets, arranged in the aforementioned Defendant TG container, by Defendant Upala, its employees, agents, or servants, in the course and scope of Defendant Upala's business enterprise, venture, partnership, agency, and/or transactions, with Defendant CHR and/or Defendants C.H.Robinson, as part of the sale and supply of pineapples, a product, identified and discussed herein, which Defendant Upala and Defendant CHR and/or Defendants

5

C.H. Robinson, identified herein, incorporated by reference, produced, packaged, designed, stowed, loaded, delivered, supplied and sold into the stream of commence.

29. It is believed and averred that, on or about April 7, 2016, Defendant TG delivered Container TRIU8053226, which contained the boxed and palletized 1500 boxes of pineapples to Puerto Limon, Costa Rica, to the Moin Port Dock, alongside a ship, identified as the "Santa Maria 16147".

30. It is believed and averred that Defendant TG transported Container TRIU8053226 by truck from Defendant Upala's farm, its packing station, property owned, possessed, or controlled by Defendant Upala, to Moin Port Dock to be loaded onto the Santa Maria, a ship, without incident or damage to the aforementioned Container TRIU8053226 and/or its pineapple packaging or contents.

31. It is believed and averred that the aforementioned ship, Santa Maria, is identified in a Bill of Lading No. 1SBL1PH16147, discussed herein, incorporated by reference. See Exhibit "1."

32. It is believed and averred that the Santa Maria is a ship used by Defendants C.H. Robinson, Defendant Isabella, and Upala, by agreement, for the delivery of the subject pineapples, within the subject pineapple Defendant TG Container TRIU8053226, pursuant to a New York Produce Exchange ("NYPE") charter and that this charter agreement is referenced and incorporated within the Defendant Parties' (for the shipment, Defendants C.H. Robinson, identified herein, incorporated by reference, Defendant Upala, and Defendant Isabella, through its agent, Interoceanica, identified herein, incorporated by reference) Bill of Lading for the subject pineapples, Bill of Lading No. 1SBL1PH16147, Exhibit "1," identified above and discussed herein.

33.     It is believed and averred that Defendant Upala consented to personal jurisdiction in the United States pursuant to the terms of the NYPE charter.

34.     It is believed and averred that, on April 7, 2016, after Defendant TG delivered container TRIU8053226 to the Moin Port Dock, at Puerto Limon, Costa Rica, to the Santa Maria, it was loaded, without incident, onto the ship, where it was stowed, without incident in loading and stowage, by Defendant Isabella, by its agents, employees, or servants, pursuant to the agreements made by the parties to the Bill of Lading, identified above and herein, Bill of Lading No. 1SBL1PH16147, Exhibit "1."

35.     The parties to Bill of Lading No. 1SBL1PH16147, identified and discussed herein, are Defendants CHR, CHRI, Isabella, and Upala.  See Exhibit "1."

36.     Pursuant to the terms of Bill of Lading No. 1SBL1PH16147, it is believed and averred that Defendant Upala expressly consented to personal jurisdiction in the United States, with venue, by agreement by Upala and the Bill of Lading parties, to be in the United States District Court for the Southern District of New York.

37.     As discussed herein, jurisdiction and venue are proper in the United States District Court for the Eastern District of Pennsylvania because, *inter alia*, as discussed  herein, Plaintiffs, Philadelphia, Pennsylvania residents, suffered injury and damage, caused by Defendants' wrongdoing, negligence, defective product, and harm, in Philadelphia, as discussed herein, incorporated by reference.

38.     It is believed and averred that Defendant CHR and/or Defendants C.H. Robinson, identified herein, by their agent, Trust Control International, among other actions and undertakings, identified herein, incorporated by reference, undertook to (a) inspect the subject pineapples, grown, harvested, processed, supplied, delivered, and sold, before they were loaded

onto Container TRIU8053226; (b) to inspect the subject Container TRIU8053226; and *inter alia,* (c) to document the loading, packing, and sealing of Container TRIU8053226 at Defendant Upala's farm, its packing station, at property owned, possessed, and controlled by Defendant Upala.

39.     It is believed and averred that Defendants C.H. Robinson, identified herein, incorporated by reference and/or Defendant CHR,  by Defendants C.H. Robinson's and/or Defendant CHR's agent, Trust Control International, its employees, servants, or agents, photographed Container TRIU8053226, as part of Defendants C.H. Robinson's and/or Defendant CHR, undertaking to document the subject pineapples' packaging, loading, and shipment for, inter alia, traceability and other purposes, related to the United States pineapple importation business enterprise undertaken by Defendants C.H. Robinson and/or Defendant CHR, identified herein by Defendant Upala in accordance and/or association with their joint venture, partnership or enterprise, in creating a global sales network for Defendant Upala's pineapples, which included their importation into the United States, with the intended United States import destination for the subject pineapple product,  by Defendant Upala and by Defendnats CHR and/or Defendants C.H. Robinson, in this matter, to be Philadelphia, Pennsylvania.

40.     It is believed and averred that "Picture No. 7", shown below, is a photograph taken by Defendants C.H. Robinson's and/or by Defendant CHR's inspection agent, Trust Control International, as part of the pineapple inspection undertaking, performed by Defendants C.H. Robinson, identified herein and/or Defendant CHR, through their agent, Trust Control International, its employees, servants, or agents, at Defendant Upala's property, believed and averred to be at its pineapple packing station, on April 2, 2016, which shows Container

8

TRIU8053226, which, upon information and belief, is taken after it was packed with the subject pineapples:

**PICTURE No. 7 Container**



41. It is believed and averred that Container TRIU8053226 has Defendant Isabella's name printed on it.

42. As Defendant CHR's and/or Defendants C.H. Robinson's agent, Trust Control's actions, which include its wrong-doing and/or negligence in its inspection undertakings are the responsibility of Defendant CHR and/or Defendant C.H. Robinson and/or Defendant Upala.

43. It is believed and averred that, at all times relevant hereto, Defendants CHR and/or Defendants C.H. Robinson, identified herein, were in a joint venture, partnership, enterprise, and/or agent relationship wherein Defendant CHR and/or Defendants C.H. Robinson imported Defendant Upala's pineapples for sale in the United States.

44. It is believed and averred that, at all times relevant hereto, pursuant to the aforementioned venture, partnership, enterprise, contract, business and/or or agent relationship, Defendant CHR and/or Defendants C.H. Robinson had agreed to make all of the import and transportation arrangements, which included securing the United States import permit, arranging transportation and shipping to get the pineapples to the United States, and had contracted and

9

engaged Defendant Upala to grow, harvest, process, package, palletize, pack, secure, position, and load pineapples for shipment from Costa Rica to the United States and, in the instant matter, to Philadelphia, Pennsylvania.

45.     As discussed herein, incorporated by reference, Defendants CHR, CHR, Inc., and CHRI, identified above, incorporated by reference, are related corporate Defendants.

46.     It is believed and averred that Defendants CHR, CHR, Inc., and CHRI, identified above, incorporated by reference, are the subsidiaries, direct or indirect, to Defendant C.H. Robinson Worldwide, Inc. ("CHRWW").

47.     Defendant C.H. Robinson Worldwide, Inc. ("CHRWW") is a Delaware Corporation with principal place of business located, upon information and belief, at 14701 Charlson Road, Eden Prairie, Minnesota.

48.     It is believed and averred that Defendant CHRWW is the owner and was so, at relevant times herein, of the tradename and/or trademark "Robinson Fresh".

49.     It is believed and averred that Defendant CHRWW has, at relevant times alleged herein, permitted Defendant CHR to use the name, "Robinson Fresh," formally by license, agreement, or informally, which, Defendant CHR uses to refer to itself as it conducts its fruit import business under this name, in an unincorporated division within Defendant CHR, known as "Robinson Fresh."

50.     In this Amended Complaint, Defendants CHR, CHR, Inc., CHRI, and CHRWW are referred to individually and collectively, jointly and severally, as "Defendants C.H. Robinson," including as set forth above as "Defendants CH Robinson", and/or as "Defendants Robinson."

10

51.    All averments referencing "Defendants C.H. Robinson", "Defendants CH Robinson," and/or as "Defendants Robinson" refer to each of the Defendants CHR, CHR, Inc., CHRI, and CHRWW, individually and collectively, jointly and severally, as if fully and completely set forth against each said Defendant individually.

### D.    Defendants CH Robinson's and Upala's Pineapple Import Business

52.    On February 20, 2019, Plaintiff took the deposition of Michael Castagnetto at 775 Prairie Center Drive, in Minnesota.

53.    In Mr. Castagnetto's deposition, he testified as the corporate designee for Defendant C.H. Robinson Company, Defendant CHR, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.

54.    In this deposition, Mr. Castagnetto stated the following with regard to the subject Upala Pineapple shipment, identified herein, incorporated by reference: (a) He is vice-president of global sourcing with Robinson Fresh, which is a division of Defendant C.H. Robinson, referring to Defendant C.H. Robinson Company, p. 5:8-17; (b) In this position, he oversees the fresh produce business for Robinson Fresh, referring to the unincorporated division of Defendant C.H. Robinson Company ("CHR"), *Id.* at P. 5:18-23; (c) "Robinson Fresh" is a trade name, a trade mark, that refers to Defendant CHR's business as a marketer and broker of fresh produce commodities from global supply chains to a global customer base. *Id.* at P 5:24-25; 6:1-10; (d) Defendant CHR has had a course of dealing for Defendant Upala that dates back to at least 2009 *Id.* at P. 6:14-22; (e) During this time, from 2009 through 2016, and thereafter, Defendant CHR's course of dealing with Defendant Upala has involved the import of pineapples from Defendant Upala's farm in Costa Rica *Id.* at P. 6:23-25; 7:1-3; and, among other things, (f) that Defendant

11

Upala was a Preferred Grower for Defendant CHR and, as such, pursuant to their agreement, Defendant CHR "managed Upala" as its Preferred Grower. *Id.* at P. 7:9-25; 8:1-10.

55.    In his deposition, Defendant CHR's designee, Mr. Castagnetto, testified that Alfredo Volio was president of Defendant Upala and that Mr. Volio was Mr. Castagnetto's primary contact with Defendant Upala.  Castagnetto Deposition at P. 37:3-10.

56.    It is believed and averred that, on April 13, 2016 and before, at relevant times, the president of Horizon Stevedoring Company was Tim Brown.

57.    It is believed and averred that, on April 13, 2016 and before, at relevant times, the terminal manager for Horizon Stevedoring Company was Sharon Bailey.

58.    It is believed and averred that, before April 13, 2016, both Mr. Brown and Ms. Bailey, and/or either of them, had complained to Defendant Isabella Shipping Co., Ltd., identified herein, directly and/or indirectly through its agent, employee and/or representative, including that of Interoceanica, its agents, employees or servants, with the intent that corrective measures would be conveyed and implemented, that containers of pineapples shipped by Defendant Isabella from Defendant Upala, identified herein, that were imported by its consignee, Defendants C.H. Robinson and/or Defendant CHR,  identified herein, incorporated by reference, were not properly stowed, loaded, secured, and/or packed properly or adequately.

59.    On June 10, 2019, at her deposition, Sharon Bailey testified as follows: (a) before April 13,2016, Horizon had discussions with Defendant Isabella about pineapples not being stowed or packed properly that leaned within their shipping container, that, thereby created and/or presented an unsafe condition, a tipping hazard; Bailey depositions at page 14:22-24; 15: 1-5; Horizon's terminal manager was frustrated because, despite prior complaints about

12

improperly loaded pineapples, within shipped by Defendants' and/or Defendants shipping containers as packed Defendant Isabella, this problem was not corrected; P.16: 22-24; 17: 1-8.

60. Horizon's terminal manager testified that, despite prior complaints about the pineapples shipped by Defendant Isabella being improperly loaded, secured and/or stowed, within the shipping containers, these unsafe conditions were not corrected before April 13, 2016, stating that "It's frustrating to repeat yourself constantly, especially when safety is concerned." *Id.* at 17:12-14.

61. It is believed and averred that these complaints were conveyed and/or transmitted to Defendants C. H. Robinson, Defendant CHR and/or Defendant Upala and/or should have been and/or timely provided, were not properly, or adequately, or reasonably corrected or addressed.

62. It is believed and averred that Defendant Isabella failed to properly or reasonably convey the Horizon complaints to Defendants C. H. Robinson, Defendant CHR, Defendant Upala and/or to Defendant TG.

63. On July 22, 2015 and, upon information and belief, before and after said date, Defendant CHR engaged in a continuing business relationship, venture, partnership and/or enterprise, as a pineapple importer for Defendant UPALA AGRICOLA, SA ("UPALA"), identified herein, incorporated by reference.

**E.  The CHR/Upala Pineapple Contract**

64. On July 22, 2015, Defendants CHR and Upala entered into a written contract, a true and correct copy of which is attached hereto as Exhibit "2."

65. This contract (Exhibit "2") is identified as the "C.H. Robinson Preferred Vendor Purchase Agreement", between Defendant CHR and Defendant Upala.

13

66.    This contract may also be referred to herein as the C.H. Robinson/Upala "Preferred Vendor Agreement", the "Preferred Vendor Agreement", the "Subject Contract", the Subject Pineapple Contract", the CHR/Upala contract, and/or as the "Pineapple Agreement."

67.    In this subject contract (Exhibit "2"), Defendant Upala is identified as having an office located at PO Box 43-5705, Upala, Costa Rica. *Id.*

68.    In this subject pineapple contract (Exhibit "2"), Defendant CHR is identified as "C.H. Robinson Company, dba Robinson Fresh, with offices at 14701 Charlson Road – Suite 900, Eden Prarie, MN 55347-7747. *Id.*

69.    In this subject pineapple contract, (Exhibit "2"), Defendant CHR states that it has entered the agreement on behalf of itself and "on behalf it its affiliate and subsidiary entities".

70.    It is believed and averred that this agreement includes, as unidentified intended beneficiaries, Defendants CHRI, CHR, Inc., and CHRWW.

71.    It is believed and averred that Defendants C.H. Robinson, including the "Robinson" Defendants in the preceding paragraph were intended third party beneficiaries to said agreement.

72.    The Defendants' C.H. Robinson, and/or Defendant CHR and Defendant Upala aforementioned Pineapple Agreement (Exhibit "2") is signed by Jim Lemke on behalf of Defendant CHR, identified therein as "C.H. Robinson Company". Exhibit "2."

73.    At the deposition of Michael Castagnetto, who testified as Defendant CHR's designee, Mr. Castagnetto identified Mr. Lemke as the President of Robinson Fresh, the unincorporated division of Defendant CHR, Defendant C.H. Robinson Company. Castagnetto Deposition at P. 39:3-21.

14

74.     The Defendants' C.H. Robinson and/or Defendant CHR and Defendant Upala Pineapple Agreement, Exhibit "2," is signed by Alfredo Volio on behalf of Defendant Upala.

75.     In the subject pineapple agreement, Mr. Volio identifies himself as the Chief Executive Officer ("CEO") of Defendant Upala. *Id.*

76.     Mr. Castagnetto is identified in the subject agreement as the designee for Defendant CHR for notice.  Exhibit "2" at CHR00022, paragraph 12.

77.     In the agreement, Defendant Upala agreed to personal jurisdiction in the United States with regard to the subject agreement, for a hearing on disputes to occur in Minneapolis, Minnesota. *Id.* at 14.3.2.

78.     Defendant C.H. ROBINSON INTERNATIONAL, INC. ("CHRI") is a foreign business with principal place of business located at 11760 Miramar Parkway, Miramar, Florida 33025. It is believed and averred that Defendant CHRI is a principal or an agent of Defendant CHR and was so at relevant times alleged herein.

79.     Defendant CHRI is believed to also conduct business at 14701 Charlson Road, Eden Prairie, Minnesota 33025.

80.     Defendant CHRI is identified as the notification party on the Bill of Lading, Bill of Lading No. ISCBLIPH16147020. Exhibit "1."

81.     Defendant CHR is identified as the consignee on the Bill of Lading, Bill of Lading No. ISCBLIPH16147020. Exhibit "1."

82.     It is beleived and averred that, as consignee, Defendant CHR and Defendant Upala were in a joint venture and/or agency with regard to the aforementioned subject pineapple preparation, processing, product supply, distribution and/or sale.

15

83.    All averments herein apply to Defendants, directly and indirectly, since Defendants acted by their employees, servants, and/or agents.

84.    It is believed and averred that Defendants CH Robinson, including Defendant CHR, and Defendant Upala were, at all times alleged herein, principal and agent, respectively, and/or including as agent and principal, respectively, with regard to the subject pineapple shipment, discussed herein.

85.    It is believed and averred that Defendants CH Robinson and Defendant Upala were, at all times alleged herein, joint venturers, members or associates in a common enterprise, mutual agents, and/or partners, with regard to the subject pineapple shipment, discussed herein.

86.    Defendants C.H. Robinson and, in particular, Defendant C.H. Robinson Company ("CHR") have had an on-going course of business in the business of importing Defendant Upala's pineapples into the United States, through Philadelphia, since 2009.

87.    Defendants are responsible for the sale, distribution and supply of an unsafe product, pineapples, as packaged, sold supplied, distributed and delivered to Philadelphia, described herein, incorporated by reference pursuant to (a) the doctrines of agency; (b) respondeat superior; (c) negligence and/or strict products liability law.

II.    **CHR Cash Advances to Upala, Defendant C.H. Robinson's and/or Defendant CHR's Product Inspection, and at the parties Defendant Upala's Farm, Shipment of the Pineapples**

    A. **CHR's Cash Advances to Upala to Fund the Pineapple Grow, Processing, and Shipment**

88.    On July 15. 2015 and on December 2, 2015, Defendant C.H. Robinson Company ("CHR") entered into written agreements for Defendant CHR to advance money to Defendant Upala.

16

89.     Before the July 22, 2015 agreement ("Exhibit "1"), referred to above, it is believed and averred that these Defendants, Defendants C.H. Robinson and, in particular, Defendant C.H. Robinson Company ("CHR"), and Defendant Upala have had other prior agreements for the import of Defendant Upala Pineapples into the United States, through Philadelphia and/or elsewhere in the United States.

90.     These written "cash advance" agreements are signed by Defendant CHR's employee, Mr. Lemke, and by Defendant Upala's CEO, Mr. Volio.

91.     Alternatively and/or in addition, Mr. Lemke ws also an employee, agent, or servant of Defendants C.H. Robinson at all relevant times.

92.     At Mr. Castagnetto's deposition, Defendant CHR's corporate designee, testified that "these agreements are designed to allow us [Defendants C.H. Robinson] to provide cash flow to the [Upala] farm, and so we would have provided them [Defendant Upala] a sales advance, which . . . in [the] terms of this agreement is a prepayment on future shipments." Castagnetto Deposition at PP. 114:25; 115:1-5.

93.     Defendant CHR and/or Defendants C.H. Robinson, made payments to Defendant Upala after July 22, 2015 and before April 1, 2016.

94.     Defendant CHR and/or Defendants C.H. Robinson made payments to Defendant Upala, in advance, concurrent with the execution of Exhibit 2, the subject Pineapple Contract.

95.     These advance payments to Defendant Upala, the July 22, 2015 advance, and the December 2, 2015 advance, refer to the subject pineapple contract. Castagnetto Deposition at P. 118:14-23.

96.    It is believed and averred that these Defendant CHR cash advances to Defendant Upala included Defendant CHR's funding of the grow, production, harvest, processing, manufacture, packaging and loading of the subject pineapple shipment.

**B. Defendants C.H. Robinsons' and/or Defendant CHR's Permit for Import**

97.    For the subject pineapple shipment, at issue in this matter, Defendant CHR, Defendant CHRI, and/or Defendants C.H. Robinson, obtained a permit to import plants and plant products, pursuant to 7 CFR 319.56, et seq.

98.    It is believed and averred that this permit, identified herein, was used by Defendants C.H. Robinson and/or by Defendant CHR as part of their common business and/or enterprise to import, among other things, Defendant Upala's pineapples at issue in this matter, into the United States at the Philadelphia, Pennsylvania Port, Pier 82, identified and discussed herein, incorporated by reference.

99.    It is believed and averred that the aforementioned permit (subject USDA Permit) is a permit corresponding to Permit Number P56-14-06192, and application number P587-140624-019, issued to Defendant C.H. Robinson Company, issued on July 16, 2014 and which was to expire on June 23, 2017.

100.    Alternatively, Defendants said permit was obtained and/or secured also by Defendants C.H. Robinson, identified herein.

101.    The subject USDA Permit included Defendant CHR's request to import pineapples from Costa Rica.

102.    Without the aforementioned United States Import Permit, Defendants C.H. Robinson, Defendant CHR and Defendant Upala would not have been permitted to import Defendant Upala's pineapples into the United States, including the subject pineapples.

18

103.    At all relevant times alleged herein, Defendant CHR and/or Defendants C. H. Robinson, identified herein, provided the means, including cash, and methods by which Defendant Upala's pineapples were grown, packaged n container, supplied, distributed, delivered and/or sold within the United States.

104.    Among other things, Defendant CHR and/or Defendants C.H. Robinson provided the components necessary, by direct or indirect rental, agreement, or arrangement with Defendant Upala, with Defendant Upala's agreement, notice, knowledge, and/or understanding for Defendant Upala's pineapples to be loaded into and secured for import into the United States, including:

a.    Renting, supplying, delivering, transporting, and/or securing, directly or indirectly, the aforementioned Defendant TG shipping container for the subject pineapples;

b.    Securing inspection of the subject pineapples;

c.    Securing transportation and delivery of the subject pineapples;

d.    Controlling the packaging and labeling of the subject poineapples.

**C. Defendants C.H. Robinsons' and/or Defendant CHR's Undertaking to Inspect the Upala Pineapples and the Subject Pineapple Shipment at the Upala Farm, before, during, and after the Pineapple Packing Process.**

105.    Before the subject shipment, Defendants C.H. Robinson and/or, in particular, Defendant CHR incorporated and/or made a practice, custom, habit or course of dealing, as part of their quality and control, to inspect the pineapples being imported into the United States.

106.    This inspection practice was described by Defendant CHR's designee, Mr. Castagnetto, at his deposition, wherein he testified that Defendants C.H. Robinson and/or Defendant CHR, for this process, hires a "third party [to] inspect every load that we have packed at Upala", referring to Defendant Upala.  Castagnetto Deposition at P. 63:25; 64:1-4.

19

107.    Defendant CHR's designee testified that the purpose of this inspection, conducted at Defendant Upala's farm, of the imported Pineapples is to "make sure that what is packed . . . meets the specifications from a quality perspective of our brand . . . [and to make sure that] the product meets what we want it to be. *Id. at* 64:8-11.

108.    Defendant CHR's and/or Defendants C.H. Robinson's packing and container inspection is part of Defendant CHR's and/or Defendants C.H. Robinson's undertaking in their quality control process, incorporated as part of their common practice and business enterprise with Defendant Upala for quality control, and which is a material part of these parties' pineapple agreement (Exhibit "1"), and/or an additional control over the means, methods and management by which these Defendants, common business practice, enterprise, or venture of importing Defendant Upala's pineapples into the United States.

109.    Pursuant to this arrangement, Defendants C.H. Robinson and/or, in particular, Defendant CHR, hires the third party to perform these inspections here, Trust Control International, on Defendants C.H. Robinson's and/or, in particular, Defendant CHR's behalf as an express or implied agent of Defendants C.H. Robinson and/or, in particular, of Defendant CHR and/or Defendant Upala.

110.    At his deposition, on behalf of Defendant CHR, Mr. Castagnetto testified as follows: Q: In . . . other words, you hired a company as your agent to perform inspections, correct? A: Correct. Q: And their job was defined by the scope of what you gave that company to do, correct? A: Correct. *Id. at* 64:12-17.

111.    Defendants C.H. Robinson and/or, in particular, Defendant CHR failed to properly adequately, or reasonably undertake to perform this quality control undertaking because they did not properly, reasonably or adequately inspect the stowage, loading, palletization, and/or

securing of the pineapple cargo within the aforementioned Defendant TG Container after the subject pineapples had been loaded onto the container.

112. Defendants C.H. Robinson and/or, in particular, Defendant CHR undertook, at times relevant herein, to inspect the subject pineapples, before, during, and after packing of the subject pineapples and/or did so, through an agent, hired by Defendants C.H. Robinson and/or, in particular, Defendant CHR, which performed these inspections, at the direction and control of Defendants C.H. Robinson and/or, in particular, Defendant CHR, in Costa Rica, at Defendant Upala's Farm, or property, owned or controlled by Defendant Upala.

113. These pineapple quality control inspections, made by Defendants C.H. Robinson and/or Defendant CHR's agent, for pineapples, were a regular part of Defendants C.H. Robinsons' and/or Defendant CHR's course of dealing, common business, enterprise, venture and/or practice with Defendant Upala and were undertaken and incorporated within by said Defendants for import of common, joint, business and/or enterprising plan the subject pineapple shipment.

114. The subject pineapple shipment included an inspection performed by Defendants C.H. Robinson and/or, in particular, Defendant CHR, through their agent, Trust Control International, and was made in Costa Rica, during the pineapple packing process, and included inspection periods before, during, and after the packing, loading, stowage, and/or of the aforementioned pineapples into a container unit, described as a 40 foot ("40'") refrigerated container, with identification number TRIU8053226, the Defendant TG container, at Defendant Upala's packing station, Defendant Upala's possessed and controlled property.

115. The Defendant CHR and/or Defendants C.H. Robinson pineapple inspections are referred to herein as the Pineapple Inspections, which occurred during the Pineapple Packing

21

Process, at Defendant Upala's farm or at property owned or controlled by Defendant Upala, and were performed by Defendants C.H. Robinson and/or, in particular, by Defendant CHR, through a third party agent of Defendants C.H. Robinson and/or, in particular, by Defendant CHR, with Defendant Upala's knowledge, consent and pursuant to the aforementioned "Pineapple Contract" Exhibit "2."

116.    It is believed and averred that the inspection of the subject pineapples was performed by Defendants C.H. Robinsons and/or, in particular, by Defendant CHR, through their third party agent, before, during, and after the subject pineapples were packed and was performed, in this instance, for the subject pineapples, pursuant to the course of dealing, ordinary business, common venture, plan, enterprise and/or contract for Defendants C.H. Robinsons, and/or, in particular, Defendant CHR, and Defendant Upala, by a third party agent of Defendants C.H. Robinson and/or, in particular, of Defendant CHR.

117.    It is believed and averred that the direct physical activities of stowing, loading, palletizing, securing, and counting of the pineapples, including for the subject pineapple shipment, was performed for the subject shipment by Defendant Upala, its employees, servants, or agents.

118.    It is believed and averred that Defendant Upala's and/or those of Defendant Upala's employees, agents or servants were performed in furtherance and as part of Defendant Upala's actions, as agent and operative in the common business venture, and/or enterprise with Defendants C.H. Robinson and/or Defendant CHR.

119.    It is believed and averred that Defendants C.H. Robinson and/or Defendant CHR indirectly participated in this loading, stowage, palletization, securing, and counting process and/or should have done so, properly, adequately or reasonably through their undertaking and/or

venture, agreement, plan, or business ventures and/or agency with Defendant Upala, at relevant times herein.

120.    It is believed and averred that the aforementioned activities of pineapple loading, palletization,  stowage, and securing were performed by Defendant Upala in the course and scope of its business venture, common enterprise and/or agency with Defendants C.H. Robinson and, in particular, Defendant CHR.

121.    These Defendants C.H. Robinson's and/or Defendant CHR's, pineapple inspections occurred during the pineapple packing process, which includes the pineapple processing of cleaning, boxing, palletization, securement, stowage, loading, and placement within a refrigerated container, the Defendant TG container, identified herein, at Defendant Upala's farm and/or at property controlled or owned by Defendant Upala, in Costa Rica.

122.    For the subject pineapple shipment, at issue in this matter, Defendants C.H. Robinson and/or, in particular, Defendant CHR hired Defendant Trust Control International ("Trust Control") to be its third party agent to inspect the subject pineapples at Defendant Upala's farm.

123.    Trust Control prepared a "Loading Survey Report", dated April 12, 2016, referenced by CERT. No.: CR-13875-1316, which refers to the inspection of the subject pineapples which are the product in the "consignment" "in accordance with instructions received from Messrs. C.H. Robinson." CHR Bates No. CHR00029 at first page.

124.    In this Trust Control "Loading Survey Report", Trust Control identifies the inspection dates, whereon it inspected the subject pineapple shipment, as occurring on April 1 and April 2, 2016. *Id.*

23

125.    In this Trust Control "Loading Survey Report", Trust Control identifies the shipment by Purchase Order, as UP18416.

126.    In this Trust Control "Loading Survey Report", Trust Control identifies the pallets on which the subject pineapples, in boxed, had been placed, upon as "American Pallets."

127.    These American Pallets were, upon information and belief required or specified by Defendants C. H. Robinson and/or Defendant CHR for Defendant Upala to use in their loading, packing, stowage, and securement of the subject pineapples.

128.    It is believed and averred that, prior to the subject pineapple shipment, Defendant Upala was identified by Defendants C. H. Robinson and/or Defendant CHR and accepted by them as their "Preferred Vendor or Grower" of Pineapples.

**D.    Defendants C.H. Robinson/Defendant CHR Controlled Defendant Upala's Packaging and Labeling**

129.    It is believed and averred that, pursuant to the subject Defendants C.H. Robinson's and/or Defendant CHR's preferred grower program, or otherwise, Defendants C.H. Robinson and/or, in particular, Defendant CHR required Defendant Upala to box and label the pineapple shipments, by Defendant C.H. Robinsons' and/or Defendant CHR's designations to include labels that stated that the product was "REFRIGERATED" clearly marked on the product's package, and, among other things, that the pineapples be put on pallets, known as "American pallets", which used all "wood packaging material" and stamped with an "ISPM 15" mark.

130.    It is believed and averred that Defendant Upala was required by Defendant CHR and/or Defendants C.H. Robinson to use pallets that conformed with Defendant Upala's

24

agreement to package and/or label the subject pineapple product, as required or specified by Defendants C.H. Robinson and/or, in particular, Defendant CHR.

131. The subject pineapples were packaged as part of the product to include boxes with labeling and marks that Defendants C. H. Robinson and/or Defendant CHR required Defendant Upala to use for the packaging of the subject pineapples and which Defendants C. H. Robinson and/or Defendant CHR exercised control trough a label licensing agreement with Defendant Upala.

132. Defendant Upala has admitted, in an affidavit, that it "produced the pineapples that are related to the claim in this [civil action]."

133. Defendant Upala has admitted that it "produced, packaged and delivered the [subject] pineapples to the client [believed and averred to be Defendants C.H. Robinson, and/or, in particular, Defendant CHR] at our [Defendant Upala's] packing plant in Upala, Costa Rica.

134. Defendants C.H. Robinson's and/or, in particular, Defendant CHR's agreement with Defendant Upala, for the subject pineapples, required that they be delivered by Defendant Upala, by the Delivery Date at the Destination . . . ." Exhibit "2" at CHR Bates No. CHR0020.

135. In Defendants' agreement, Exhibit "2," Defendants C. H.Robinson and/or Defendant CHR and Defendant Upala agreed that the "Delivery Date" means the date or dates identified in an order. Exhibit "2" at 1.1.

136. In Defendants' agreement, Exhibit "2," the aforesaid Defendants agreed that the "Destination" means "that location or locations identified in an Order where [Defendant Upala] is required to deliver the Product by the Delivery Date. *Id.* at 1.2.

137. It is believed and averred that the purchase order for the subject pineapple shipment is UP 18416.

138.    It is believed that, at all relevant times, Defendant Upala and Defendants C.H. Robinson and/or, in particular, Defendant CHR, understood that the "Destination" for the subject pineapple order was Pier 82, in Philadelphia, for the imported boxed and palletized pineapples, in the above referenced Defendant TG container, which were grown, processed, and produced by Defendant Upala, and inspected by Defendants C.H. Robinson and/or Defendant CHR by their agent.

139.    It is believed and averred that Defendants C.H. Robinsons' and/or, in particular, Defendant CHR's inspecting agent, Trust Control, (hereinafter Defendant CHR's inspecting agent or inspector) witnessed the processing, counting, and loading of the subject pineapples at Defendant Upala's Farm and/or at a property Defendant Upala owned or controlled as the agent of Defendants C.H. Robinson and/or Defendant CHR and/or Defendant Upala.

140.    It is believed and averred that there is a purchase order (P.O.) from Defendant Upala to Defendants C.H. Robinson and/or Defendant CHR, identified as Upala Purchase Order 18416.

141.    It is believed and averred that, on or about April 2, 2016, Defendant Upala issued to Defendants C.H. Robinson and/or Defendant CHR invoice, identified as Invoice Number 17584, for the sale of 1500 boxes of pineapples, to be put in Container No. TRIU8053226.

142.    It is believed and averred that Defendants C.H. Robinson and/or Defendant CHR and Defendant Upala had agreed to a departure date, for the delivery of the subject pineapples from Defendant Upala's farm, to be April 2, 2016.

143.    It is believed and averred that the aforementioned April 2, 2016 departure date is referenced by Defendant Upala's P.O. No. 18416.

26

144.    It is believed and averred that Trust Control International, as agent and inspector for Defendants C.H. Robinson and/or Defendant CHR, reported to these Defendants that it, Trust Control, had observed the arrival of the subject Container No. TRIU8053226 for the subject pineapples at the Upala Packing Station, at Defendant Upala's property, in Defendant Upala's possession and control, on April 2, 2016.

145.    Defendant CHR's, Defendants C.H. Robinson and/or Defendant Upala's, inspector, agent, Trust Control, stated and reported to Defendants C.H. Robinson and/or Defendant CHR that it had observed the loading of the subject pineapples in the identified container at the Upala Packing Station on April 2, 2016.

146.    This Defendant CHR and/or Defendant C.H. Robinson inspector identified and reported to Defendants C.H. Robinson and/or Defendant CHR, that the 40 foot refrigerated container in which the subject pineapples were loaded was Defendant TG Container No. TRIU 805322-6.

147.    This Defendant CHR and/or Defendants C. H. Robinson inspector reported to Defendants C.H. Robinson and/or Defendant CHR that it had observed Defendant Upala, its agents, servants, or employees, loading the aforementioned subject pineapples into this Container TRIU 805322-6 on April 2, 2016 from 10:00 to 10:24.

148.    These observations and reports, made by Trust Control, to its principal, Defendants C.H. Robinson and/or, in particular, Defendant CHR, and/or Defendant Upala, are set forth in Trust Control's report, prepared at the request of Defendants C.H. Robinson and/or, in particular, Defendant CHR, as follows:

27

## LOADING OF THE CONTAINER

| Container No. | Date of Arrival of the Container to the Packing Station | Date of Loading of the Container | Start Time of Container Loading | End Time of Container Loading |
|---|---|---|---|---|
| TRIU 805322-6 | 04/02/2016 | 04/02/2016 | 10:00 | 10:24 |

**E. Arrival of Santa Maria, with Container No. TRIU8053226 in Philadelphia with Unloading Without Incident**

149.    As stated above, the subject Container No. TRIU8053226, containing the 20 pallets of pineapples, boxed in 1500 boxes, arrived without sea incident in Philadelphia, at Pier 82, on April 12, 2016.

150.    It is believed and averred that the subject Defendant TG container was off loaded the Santa Maria at Pier 82 without incident.

151.    It is believed and averred that there was no incident that harmed or damaged the subject Defendant TG container or its contents after its off-loading from the Santa Maria through the time of Plaintiff-Husband's injury, described herein.

152.    As reported by Defendant Isabella, through its agent or directly, there was no incident at sea that harmed or damaged the subject, Defendant TG Container or its contents during its voyage from Puerto Limon to Philadelphia.

153.    The subject Defendant TG Container, after it was loaded at Defendant Upala's farm, was sealed by seal number 9916, which was not opened or distrurbed until it was broken,

as directed by United States Custom, Border Protection at Pier 82, in Philadelphia, immediately before Plaintiff-Husband's injury.

### F.  Incident Facts and the Subject Pineapple Shipment

154.   On April 13, 2016, Plaintiff-Husband Elliot Miranda, was injured in the course and scope of his employment for Horizon, at or about Pier 82, 2201 South Columbus Boulevard during his employment by Horizon as a stevedore.

155.   On April 13, 2016, Plaintiff-Husband was injured when Defendant CHR's, Defendants C.H.Robinson's and/or Defendants Upala pineapples, (also referred to herein as the "subject pineapples") which had not been properly secured and/or stowed for transit by Defendants, as a result of Defendants' failure to use proper, reasonable, ordinary, or due care, fell uncontrollably from the subject Defendant TG container, because they were not reasonably, properly, adequately or safely secured, blocked, palletized, loaded, or stowed and fell upon him, during the pineapple inspection.

156.   As a direct and proximate result of Defendants' tortious conduct, described herein, incorporated by reference, Plaintiff-Husband suffered, *inter alia,* a severely broken left ankle, which required emergency surgery.

157.   A true and accurate photograph, which fairly shows the scene where Mr. Miranda was crushed by the subject pineapples, is attached hereto as Exhibit "3."

158.   Plaintiffs commenced this civil action in the Philadelphia Court of Common Pleas on September 5, 2017, docketed at September Term 2017, No. 000134.

159.   This state court civil action was removed by Defendants C.H. robinson and Isabella to the United States District Court for the Eastern District of Pennsylvania, where it is docketed as 2:18-cv-00553-MMB.

160.    The subject pineapples were not properly, adequately, reasonably, or safely loaded, secured, stowed, palletized, braced, inspected or reported to be unsafe,  thereby left in an unreasonably dangerous condition, as a defective product and/or condition, because:

a.    The boxes were not properly or reasonably reinforced to prevent their weakening or collapse during shipment;

b.    The TG container, as maintained, prepared, or used, rented, supplied or provided by Defendants Upala, Isabella, Defendants C.H. Robinson, Defendant CHR, and/or Defendant TG, did not have a proper or reasonable temperature setting creating excessive moisture condensation and water build up or accumulation, which weakened the packaged pineapples;

c.    The subject pineapples were not loaded in a safe container configuration; and/or

d.    The subject pineapples, as loaded, presented too much space with the load and doors;

e.    The pallets were not properly tied;

f.    The load was not properly or adequately secured or braced.


**G. Defendant Upala Retained the Risk of Loss and Title Legal or Equitable of the Subject Pineapple before Plaintiff-husband's Injury After the Shipment's Arrival at in Philadelphia Pier 82**

161.    It is believed and averred that Defendant Upala and Defendants C.H. Robinson and/or Defendant CHR agreed that the subject pineapples would be delivered in the aforereferenced Defendant TG refrigerated container, after teh subject pineapples' placement in boxes and on pallets, inside the container, to be then sealed, with said containerized and

30

palletized pineapples  then transported by truck and ship from Defendant Upala's farm to Puerto Limon, Costa Rica, as stated above, then to Philadelphia, as Free On Board ("FOB") and/or "FCA," referencing INCO terms, meaning that risk of loss and title for the subject pineapple goods was, upon information and belief, retained by Defendant Upala until it was then transferred to Defendants C.H.Robinson and/or Defendant CHR.

162.    It is believed and averred that the subject pineapples in this shipment were properly owned by Defendant Upala in Philadelphia which, by Defendant Upala's action, its wrongdoing, created an unreasonably dangerous condition causing injury to Plaintiff-Husband and Plaintiffs' damages.

163.    At all times and for claims averred herein, the subject pineapple shipment, in the Defendant TG container, identified herein was a product, which ws sold, supplied, packaged, and/or delivered, without substantial change in an unreasonbly dnageorus condition, which was defective and, as a direct and proximate result thereto, caused injury to Plaintiff-Husband and Plaintiffs' damges, alleged herein.

164.    It is believed and averred that Defendants' pineapple shipment was not properly, adequately, reasonably, or appropriately stowed, blocked, braced, prepared, palletized, and/or secured by Defendants, and, as a direct and proximate result, said pineapple product fell onto Plaintiff-Husband  causing him serious and permanent injuries and damages, referenced herein, incorporated by reference.

165.    As a direct and proximate result of Defendants' negligence, their failure to use proper, reasonable, due, or ordinary care, Plaintiff-Husband suffered the following injuries and damages:

        a.   Injuries to his body, including broken bones;

b.  Injuries to his body requiring surgery and other necessary Medicare care;

c.  Medical costs, past and future;

d.  Lost earnings, past and future;

e.  Pain, suffering, past and future;

f.  Scarring and disfigurement;

g.  Other damages, the full extent of which are not yet fully known and all or some of which are permanent.

## JURISDICTION AND VENUE

166.  This Court has original jurisdiction over this action under 28 U.S.C. § 1332, in that the amount of controversy exceeds seventy five thousand dollars ($75,000) and Plaintiffs are citizens of states which are different from the states where Defendants are incorporated and have their principal places of business and/or involve parties of different nations.

167.  Venue is proper pursuant to 28 U.S.C.A. § 1391 and/or through §1333, et seq., because the events giving rise to Plaintiffs' claims occurred in Philadelphia, Pennsylvania on April 13, 2016.

168.  Jurisdiction is proper pursuant to the Pennsylvania Long Arm Statute, 42 Pa. C.S.A. §5322, et. seq. and international and federal jurisdiction, pursuant, *inter alia,* maritime and/or admiralty, which attaches to Defendants' actions in shipping a product and its method of delivery upon the seas, from Costa Rica to Philadelphia, as the port of destination.

169.  It is believed and averred that Defendants, one, some, or all, regularly conduct business in the city and county of Philadelphia and have, by their actions, specifically and/or generally, purposefully availed themselves to the jurisdiction of this Honorable Court by their contracts and actions in this district and conducting business at the Port of Philadelphia.

170. It is believed and averred that Defendant Upala has regularly shipped pineapple product, through Defendant C.H. Robinson, Defendant CHR and/or others on a regular basis, to Philadelphia at all relevant times alleged herein.

171. This Court has personal jurisdiction over Defendants because Defendants' tortious conduct in packaging, loading and shipping the subject pineapples factually and proximately caused injury to Plaintiff Elliot Miranda and Plaintiffs' damages in Philadelphia, Pennsylvania.

172. This Court has personal jurisdiction over Defendants because Plaintiffs' injuries and claims against Defendants arise out of Defendants' purposeful, systematic, and regular contacts with the Commonwealth of Pennsylvania.

## COUNT I – NEGLIGENCE
### PLAINTIFFS v. ALL DEFENDANTS

For their First Count, Plaintiffs aver as follows:

173. Plaintiffs incorporate by reference their averments set forth above as if fully set forth at length herein.

174. Defendants failed to exercise proper, adequate, ordinary, or reasonable care in the transport, loading, bracing, blocking, securing, stowing, inspecting, packaging, palletizing, shipment, handling, supply, distribution, shipment, and sale of the subject pineapple shipment referenced herein, which resulted in Plaintiffs' injuries and damages, discussed herein, incorporated by reference.

175. Defendants failed to use due proper, adequate, or reasonable care in their respective undertakings and/or lack of proper, adequate or reasonble conduct with regard to the subject pineapple sale, packaging, and delivery.

33

176.    Defendants created an unreasonbly dangerous and/or unsafe condition and/or product defect, that caused Plaintiff-Husband's injuries and damages.

177.    Defendants failed to use reasonable or proper care in their respective undertakings and/or with their failure to properly or reasonably inspect, brace, pack, secure, palletize, box, load, stow, and/or package the subject pineapples pursuant to reasonable, and/or other practices, including industry practice, custom, standards, and/or competent and/or workerlike practices, including by not cross bracing, blocking, securing, or otherwise preventing to use proper or adequate means of palletizing and/or securement to minimize movement and/or injury or loss when it reached its port of destination.

178.    Defendants failed to properly or adequately perform their agreed upon services and/or actions and/or undetakings, directly or indirectly, by agent, servant or employee, pursuant to their assumed or established contracts or undertakings with regard to the subject pineapple shipment.

179.    Defendants failed to use reasonable or proper care to inspect and correct the subject pineapple shipment to make sure it was properly loaded, stowed, palletized, and/or secured so it would not cause damage or injury.

180.    Defendants created an unreasonbly dangeorus condition that caused Plaintiffs' injuries and damages.

181.    Defendants failed to properly or adequately instruct, warn, or inform those opening the container of the dangers presented therein from Defendants' improperly loaded, palletized, and/or secured pineapples, the subject pineapple product and/or failed to properly or adequately provide or suggest reasonable safety devices for said contianerized product.

34

182.   Defendants failed to properly or adequately inspect and/or correct unsafe conditions for the subject pineapples and shipment.

183.   Defendants failed to use reasonble or proper care in the selection or use of packaging materials and/or package and/or containment for the subject pineapples.

184.   Defendants failed to properly or adequately warn of unsafe and/or unreasonble dangeorus conditions and/or instruct regarding procedures or devies to be used for product inspection and/or removal from the provided, supplied or rented container.

185.   As a direct and proximate result of Defendants' negligence, Plaintiffs were injured and damaged and Plaintiff-Husband suffered injuries identified and set forth above, incorporated herein.

**WHEREFORE**, Plaintiffs demand judgment and damages against Defendants, jointly and severally, for an amount exceeding $75,000.00, exclusive of interest and costs.  Plaintiffs respectfully request interest, costs, and other damages from Defendants jointly and severally.

## COUNT II-NEGLIGENCE

### MARITIME AND ADMIRALTY NEGLIGENCE

### PLAINTIFFS v. ALL DEFENDANTS

For their Second Count, Plaintiffs aver as follows:

186.   Plaintiffs incorporate by reference their averments set forth above as if fully set forth at length herein.

187.   Plaintiffs incorpórate their averments in the preceding Count and these negligence claims apply to Defendants'respective maritime neglgiene in their respective failure to properly, reasonably, adequately, or safely load, stow, secure, palletize, ship, distribute, deliver, prepare, inspect, correct, and/or transport the subject pineapple shipment.

35

188.   As a direct and proximate result of Defendants' negligence, Plaintiff-husband was injuredand Plaintiffs suffered damage, set forth herein, incorporated by reference.

**WHEREFORE**, Plaintiffs demand judgment and damages against Defendants, jointly and severally, for an amount exceeding $75,000.00, exclusive of interest and costs.  Plaintiffs respectfully request interest, costs, and other damages from Defendants jointly and severally.

## COUNT III – STRICT LIABILITY
### PLAINTIFFS v. ALL DEFENDANTS

For their Third Count, Plaintiffs aver as follows:

189.   Plaintiffs incorporate by reference their averments set forth above as if fully set forth at length herein.

190.   Defendants C. H. Robinson, Defendant CHR, Defendant Upala, and Defendant TG were all, at relevant times alleged herein, regularly engaged in the business of selling the pineapple product, containerized, packaged, and as sold and identified herein, incorporated by reference.

191.   Defendants are merchants regularly engaged in the business of selling such products.

192.   Defendant TG's product, the container, is, as used and incorporated, a component part of the pineapple products prepared, assembled, packaged, palletized, supplied, sold, delivered, shipped and otherwise placed into the stream of commerce.

193.   Defendants' pineapple product includes its pallets, its boxes, its packaging, contianer, and/or securement, and the subject Defendant TG Container.

194.   Defendants' pineapple product, as identified herein, incorporated by reference, was unreasonably dangerous, defective, and was assembled, manufactured, supplied, sold and

36

put into the stream of commerce, in a defective and/or unreasonably dangerous condition that was without substantial change from when Defendants sold and/or delivered the subject product.

195.    Defendant TG is a seller of a product, its TC Container, identified herein, through its rental of that product.

196.    Defendants CHR and/or Defendants C.H. Robinson are manufacturers of the subject pineapple product, pursuant to Restatement (Second) of Torts, Section 400, as their name and/or mark are on said products.

197.    Defendant Isabella is a manufacturer of the subject pineapple product, its container, as its name is on the subject component product.

198.    Plaintiff-Husband was, at all relevant times alleged herein, a user or consumer of the subject product, which includes it packaging and the subject Defendant TG Contianer.

199.    Defendants' products' defective conditions caused, directly and proximately, Plaintiffs' injuries and damages, set forth herein.

200.    At all relevant times, Defendants have been and Defendants are regularly engaged in the business of selling pineapples and/or containers, by rental or otherwise, and are merchants.

201.    Plaintiff-Husband was, at all relevant times, a user and/or consumer of the subject pineapple product, as prepared, assembled, packaged, and/or containerized.

202.    Plaintiff-Husband was injured as a direct and proximate result of the subject product's unreasonably unsafe condition, its defects in manufacture, assembly, design, packaging, lack of proper or adequate warnings and/or instructions, which rendered said product unreasonably dangerous, defective, and unsafe for its intended uses and/or foreseeable misuses.

203.     Defendants' respective products were without substantial change at the time they injured Plaintiff-Husband and caused Plaintiffs' injuries and damages, identified herein, incorporated by reference.

204.     Defendants are strictly liable to Plaintiffs pursuant to the Restatement (Second) of Torts, Section 402A, and Pennsylvania law.

**WHEREFORE**, Plaintiffs demand judgment and damages against Defendants, jointly and severally, for an amount exceeding $75,000.00, exclusive of interest and costs.

## COUNT IV – LONGSHORE ACT
### 33 U.S.C. SECTION 905(b), et. Seq.
### PLAINTIFFS v. ALL DEFENDANTS

For their Third Count, Plaintiffs aver as follows:

205.     Plaintiffs incorporate by reference their averments set forth above as if fully set forth at length herein.

206.     Defendants were negligent and failed to use reasonable or due care in the loading, packing, palletizing, inspecting, or securing the aforementioned subject pineapples, as set forth above, incorporated by reference, causing, directly and proximately, Plaintiff-Husband's injuries and Plaintiffs' injuries and damages, incorporated by reference herein and hereinabove.

207.     As a direct and proximate result of Defendants' failure to use proper or reasonable care, Plaintiffs were injured.

**WHEREFORE**, Plaintiffs demand judgment and damages against Defendants, jointly and severally, for an amount exceeding $75,000.00, exclusive of interest and costs.

## COUNT V – LOST CONSORTIUM
### PLAINTIFFS v. ALL DEFENDANTS

For their Fourth Count, Plaintiffs aver as follows:

208.    Plaintiffs incorporate by reference their averments set forth above as if fully set forth at length herein.

209.    Defendants failed to exercise proper, adequate, ordinary, or reasonable care in the transport, loading, securing, stowing, inspecting packaging, palletizing, shipment, off-loading, and sale of the pineapple shipment referenced herein, which resulted in Plaintiffs' injuries and damages discussed herein, incorporated by reference.

210.    As a direct and proximate result of Defendants' negligence, referenced above, incorporated by reference, the subject product defects, identified above, incorporated by reference, Plaintiff-Husband suffered injuries and damages, thereby causeing Plaintiff-Wife to suffer lost consortium damages, including the loss of her husband's assistance and earnings, his society, and conjugal fellowship, and other related damages.

**WHEREFORE**, Plaintiffs demand judgment and damages against Defendants, jointly and severally, for an amount exceeding $75,000.00, exclusive of interest and costs.

Respectfully submitted,
GALFAND BERGER, LLP

BY:  _____
ARTHUR L. BUGAY, ESQUIRE
Attorney for Plaintiffs
Identification No. 62251
1835 Market Street, Suite 2710
Philadelphia, PA 19103
215-665-1600 F: 215-564-2262
abugay@galfandberger.com

Date: July 3, 2019

# EXHIBIT "1"

## ISABELLA SHIPPING CO. LTD-(BERMUDA)

### BILL OF LADING

1/ 1

| EXPORTER | DOCUMENT NO. | ISCBLIPH16147020 |
|---|---|---|

**EXPORTER**

UPALA AGRICOLA S.A.

UPALA DE SAN CARLOS DE LA ENTRADA CAÑO NEGRO 3 KMS NORTE Y 3 KMS ESTE, CIUDAD QUESADA, AL, Costa Rica

TEL:    506-2-470-8195          FAX: 506-2-4708436

**EXPORT REFERENCES**

ILI1637830  INVOICE:17584  S.C:2016010  UP#18416

**FORWARDING AGENT - REFERENCES - FMC**

**SHIPPER**

UPALA AGRICOLA S.A.

UPALA DE SAN CARLOS DE LA ENTRADA CAÑO NEGRO 3 KMS NORTE Y 3 KMS ESTE, CIUDAD QUESADA, AL, Costa Rica

TEL:    506-2-470-8195          FAX: 506-2-4708436

TEL:                    FAX:

**POINT AND COUNTRY OF ORIGIN**

COSTA RICA

**CONSIGNEE**

CH ROBINSON COMPANY

14701 CHARLSON ROAD, SUITE 1400, EDEN PRAIRIE, MN, 33025

TEL:    954 3423830          FAX:

**DOMESTIC ROUTING/EXPORT INSTRUCTIONS**

This bill of lading is issued pursuant to and subject to a ?NYPE 93 Charter? dated OCTOBER 11 2013, which is deemed to be incorporated herein.The terms and conditions contained in this bill of lading including the arbitration provision, are null and void to the extent that they are inconsistent with or contrary to the NYPE 93 Charter and addenda thereto.

**NOTIFY PARTY**

C H ROBINSON INTERNATIONAL INC.

11780 Miramar Pkwy, MIRAMAR, FL, 33025

TEL:    9543423630          FAX: 9544355663

**\*\*HAZARD DECLARATION:**

I hereby declare that the contents of this consignment are fully and accurately described below by the proper shipping name, and are classified, packaged, marked and     labeled/ placarded, and are in all respects in proper condition for transport according to applicable international and National governmental regulations. \*\* Indicates whether any of the cargo is     hazardous material under DOT, IMCO, or other regulations and indicate the correct commodity number in description of cargo below.

**PLACE OF RECEIPT**

UPALA, ALAJUELA, COSTA RICA

| EXPORTING CARRIER VESSEL | PORT OF LOADING |
|---|---|
| SANTA MARIA 16147 | PUERTO LIMON , Costa Rica |
| SEAPORT OF DISCHARGE | FOR DELIVERY TO |
| PHILADELPHIA PA , USA | |

| MARKS AND NUMBERS | NO. Of PKGS. | DESCRIPTION OF PACKAGES AND GOODS - PARTICULARS FURNISHED BY SHIPPER | | WEIGHTS | |
|---|---|---|---|---|---|
| | | | | NET KILOS | GROSS KILOS |
| PRODUCT OF COSTA RICA MADE FRESH | 1 40HCRECT | FRESH PINEAPPLES/SLAC 20 PLTS/ 1500 BOXES | TARE | 18,000 | 19,500 4,500 |
| TRIU8053226 / 9916 | | TEMP. 7.5°C . 10% VENT OPEN | | | |
| 40HCRECT | | 1 40' Reefer | | | |

If these commodities, technology, or software are exported from The United States they are in accordance with export regulations  Diversion contrary to U.S. law is prohibited

| | TOTAL: | 18,000 | 24,000 |
|---|---|---|---|

**DECLARED VALUE**

US $

Containers and cargo are carried on deck at Shipper's own risk, any warranty of seaworthiness of the vessel being hereby expressly waived by shipper, and such carriage shall in all other respects to be governed by the terms of this bill of lading and the provisions of The Carriage of Goods by Sea Act of the United States, approved April 16th 1936, notwithstanding section (c) thereof."

**FREIGHT AS ARRANGED**

RECEIVED, by the Carrier as described on the reverse hereof(hereinafter called the Carrier) from the above named shipper, the goods, or packages said to contain goods, hereinabove described in apparent good order and condition unless otherwise noted hereon, to be held and transported subject to all the written, typed, printed or stamped provisions of this bill of lading, on this and on the reverse side hereof, to the port or place of discharge named above or so near thereunto as the ship can always safely get and leave always afloat at all stages and conditions of water and weather and there to be delivered or transshipped on payment of the charges thereon,   (TERMS OF THIS BILL OF LADING CONTINUED ON REVERSE SIDE HEREOF) IN WITNESS WHEREOF, the Master or agent of the said vessel has signed 3 bills of lading, all of this tenor and date, and if one is accomplished the others shall be void.

| MEASUREMENT | W/M | RATE | FREIGHT |
|---|---|---|---|
| | | | |

| | |
|---|---|

TOTAL U.S. CURRENCY

**LINER TERMS, FLETE MARITIMO:**          **COLLECT**

**DATED AT**          PUERTO LIMON , Costa Rica          April 07, 2016

**B/L No.:**          AS PER AUTHORITY FOR AND ON BEHALF OF THE MASTER

ISCBLIPH16147020

Master's name ........................................

AS AGENTS ONLY, Agent's name .........................

Signature .........................

# NON NEGOTIABLE

CHR00009

# EXHIBIT "2"

## C.H. Robinson Preferred Vendor Purchase Agreement

THIS PREFERRED VENDOR PURCHASE AGREEMENT (the "Agreement"), effective the 22nd day of JULY, 2015 ("Effective Date"), is by and between   Upala Agricola, with offices located PO Box 43-5707, Upala, Costa Rica, ("Seller"), and C.H. Robinson Company, dba Robinson Fresh, with principal offices at 14701 Charlson Road - Suite 900, Eden Prairie, MN 55347-7747, for itself and on behalf of its affiliate and subsidiary entities ("CHR ").

**PURPOSE AND SCOPE:** This Agreement sets forth the terms and conditions under which Seller agrees to grow, manufacture or otherwise procure Product, as defined below, and CHR agrees to purchase Product and/or, if applicable, to provide Seller with Licensed Materials, as defined below, for use with such Product and to sell such Product on behalf of Seller. Nothing in this Agreement shall prohibit Seller or CHR from entering into similar agreements with other third parties.  Now, therefore, in exchange for the promises and other valuable consideration, the adequacy of which is herein acknowledged, CHR and Seller agree each with the other as follows:

**I.   DEFINITIONS:**
**1.1**   "Delivery Date" means that date or dates identified in an Order by which Seller shall have delivered the Product to CHR at the Destination.
**1.2**   "Destination" means that location or locations identified in an Order where Seller is required to deliver the Product by the Delivery Date.
**1.3**   "Food Safety Program" means the requirements Seller must meet, as identified in the **Exhibit A "Food Safety Program Schedule."**
**1.4**   "Licensed Materials" means, in the event CHR grants a license to Seller for any Licensed Materials, any and all materials, including but not limited to any trademarks and/or service marks (registered or unregistered), trade names, trade dress, brand names, copyrights, labels, label design, color combinations, insignias or device (and any variations or modifications thereto which have been approved by CHR for use hereunder) owned, used, or licensed by CHR and sublicensed or otherwise provided to Seller under this Agreement, including as set forth in **Exhibit B "Licensed Materials Schedule".**
**1.6**   "Order" means every request for Product, placed by CHR with Seller and accepted by Seller, either orally or in writing, including electronically. Each Order shall state the Product, Price, Delivery Date, Destination, and quantity.   An Order shall include any provision of Product by Seller to CHR under a "C.H. Robinson CPDS Produce Agreement" document executed by both CHR and Seller.   An Order may identify that the Product shall be associated with and use Licensed Materials.

**1.7**   "Organic" means produce items which meet all aspects of handling, processing, packaging, labeling and agricultural standards as defined by the requirements of the Organic Foods Production Act of 1990, as amended (7 U.S.C. 6501 et seq.) and the National Organic Program, as amended (7 CFR Part 205).
**1.8**   "Price" means those mutually agreed upon prices for Product in specific quantities, as set forth in an Order.
**1.9**   "Product" or "Products" means those fresh produce or other perishable agricultural commodities grown, manufactured or otherwise procured by Seller. Product can include, if specifically requested by CHR in an Order, be Organic.   Product includes both branded and non-branded items.
**1.10**   "Specifications"   means   the   specific requirements applicable to the Product, including but not limited to Product type, size, grade, and/or weight, as are all identified in a writing (including but not limited to an e-mail or facsimile) issued by CHR to Seller.

**2.   PRODUCT:**
**2.1**   Product Sourcing: Seller shall, from time to time, as requested by CHR in an Order, provide CHR with Product.  Seller shall provide Product to CHR (or CHR's designees): (i) in the required Quantity; (ii) at the agreed upon Price, (iii) by the Delivery Date (iv) at the Destination; and (v) that conform to the Specifications.
**2.2**   Product Inspection: Within twenty-four (24) hours of Product arrival at the Destination, CHR (or its agent) shall undertake a quality inspection of the Product.  CHR shall promptly report to Seller any findings that the Product does not meet the Specification. CHR may, as governed and limited by the Perishable Agricultural Commodities Act ("PACA") rules and regulations, and cases promulgated there under, reject any Product that fails to meet Specifications.
**2.3**   Product Labeling: Seller shall package all Product sourced to CHR through an Order under this Agreement.  If CHR and Seller mutually agree, as set forth in an Order, that the Licensed Materials shall be used and associated with the Product, CHR shall

Seller Initials: ____

CONFIDENTIAL                                                    CHR00019

license the Licensed Materials to Seller and Seller shall use the Licensed Materials solely in compliance with the terms associated with the Licensed Materials, all as set forth in this Agreement and the **Exhibit B Licensed Material Schedule.**

2.4    Warranties: To the extent that the Product is intended to be fit for human consumption, Seller warrants that at the time the Product arrives at the Destination, it will be suitable for human consumption and that it will comply with the Specifications. Seller and CHR agree that the PACA rules, regulations, and cases promulgated hereunder will apply to all transactions under this Agreement. Seller further warrants and guarantees that as of the Delivery Date, the Product shall not be adulterated or misbranded (as those terms are given meaning within the Federal Food, Drug and Cosmetic Act), and that the Product, and all components thereof, will conform to and comply with all Federal, state and local statutes, regulations, ordinances and standards pertaining to the Product, including but not limited to the Bioterrorism Act of 2002. Seller further warrants that it will comply with the requirements set forth in the **Exhibit A Food Safety Program Schedule.**

2.5    Compliance with Laws:  Without limiting the forgoing, Seller shall comply with all applicable laws and regulations related to growing, harvesting, packing, manufacturing, storing, and transporting the Product, including but not limited to laws related to employment, compensation, safety and other social responsibilities.

2.5    Seller's Organic Certification.  If CHR, in an Order, procures from Seller Organic Product, Seller shall (i) prior to commencement of the term of the Agreement, obtain, and (ii) during the term of the Agreement, maintain all the required Organic certifications related to Seller's growing, harvesting, processing, manufacturing and/or sale, as applicable, of Organic Product to CHR.   The Organic certification for the Products shall be made by an agency or agencies approved by CHR and shall include "Our World Organics" as a Certified ID Mark.  In the event that Seller, in fulfilling and Order made by CHR for Organic Products, sells or distributes Products that are not Organic, then in addition to any other obligations set forth in the Agreement, Seller shall be responsible for immediately retrieving such non-Organic Products at its sole cost and expense.

2.6    Right to Inspect.  Seller shall, upon request from time to time, permit periodic inspection by CHR and/or its third party licensors of the operations of Seller, including Seller's suppliers and farmers of the Products and any other authorized handlers, at reasonable times and upon reasonable notice, and supply CHR and/or its third party licensors with specimens of the Products.

3.    **PRICE; PAYMENT PROCESS; TERMS:** Seller shall provide Product to CHR at the Price set forth in the Order.  CHR agrees to pay Seller for the Product within ten (10) days of the Delivery Date after receipt of an invoice from Seller.  Seller shall deliver all Product to CHR FOB Destination unless some other shipment term is set forth in the Order. Risk of loss for the Product shall pass to CHR from Seller upon delivery to the Destination.

5.    **DELIVERY OF PRODUCT:** Seller shall deliver, by the Delivery Date at the Destination only that Quantity of Product as CHR has specifically agreed to purchase pursuant to an Order with Seller.

6.    **INDEPENDENT CONTRACTOR:**  This Agreement shall not constitute or give rise to a partnership between the parties.   All activities by Seller under the terms of this Agreement shall be carried out by Seller as an independent contractor of CHR and not as an agent for CHR.  Neither party shall have any authority to bind the other, contractually or otherwise.

7.    **INDEMNIFICATION;    INSURANCE; LIMITATION OF LIABILITY:**

7.1    Seller shall indemnify and hold CHR and its customers harmless from and against any fines, penalties, judgments, losses and/or other damages and defend CHR and its customers from and against any and all suits, actions, proceedings, claims and or demands (including reasonable attorneys' fees and expenses associated therein), brought by CHR and/or any third party, including but not limited to any lawful governmental authority, which (i) allege and/or establish that the Product, as sourced to CHR under this Agreement, is and/or was adulterated or misbranded (as those terms are given meaning within the Federal Food, Drug and Cosmetic Act), as a result of the acts or omissions of Seller; and/or (ii) arise from or are related to any breach of this Agreement or its Exhibits or Orders by Seller, including but not limited to any warranty as to the quality of the Product at the time it was sold or otherwise provided to CHR, such quality being defective through causes arising in the manufacture, packaging, or storage of the Product by the Seller or its employees or agents or, if applicable, Seller's noncompliance with the

Seller Initials: _____

CONFIDENTIAL

CHR00020

terms set forth in Exhibit B Licensed Material Schedule. Seller's obligations under this indemnity shall not extend to or include any liability arising directly from the negligence or willful misconduct of CHR, its employees or agents.

7.2    CHR shall promptly notify Seller of the commencement of any action or legal proceedings against CHR contemplated in Section 7.1 hereunder and, if appropriate, Seller shall have the right to become a party defendant in such proceedings at its own cost.

7.3    Seller will maintain at all times hereunder, at its sole cost and expense, the following types and coverage amounts of insurance:

> 7.3.1 Workers' compensation and employer's liability coverage providing coverage in accordance with the applicable state law.
>
> 7.3.2 Automobile Liability Insurance covering bodily injury and property damages naming CHR and its customers as certificate holder with a combined single limit of $1,000,000.
>
> 7.3.3 General umbrella with $4,000,000 coverage sitting over the employers, general, and auto liability policies.

A certificate evidencing the foregoing insurance shall be delivered to CHR at its request and renewal certificates shall be delivered to CHR from time to time as requested. Such certificate shall include a provision for notification at least thirty- (30) days in advance of any material change or cancellation in the coverage's provided.

7.4    **EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY KIND IN CONNECTION WITH THIS AGREEMENT, EVEN IF THE PARTY WHO IS LIABLE HAS BEEN INFORMED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES.**

8.    **TERM, TERMINATION, AND SURVIVAL:** This Agreement shall commence as of the Effective Date, as set forth in the preamble above, and shall continue for a period of one (1) year from the date of commencement, and thereafter, without further action of the parties hereto, the Agreement shall automatically extended for additional, successive, and individual terms of one (1) year, unless and until sooner terminated in according with the terms of this Agreement. Either party hereto may terminate this Agreement at the end of the initial term or any successive term by giving to the other party thirty- (30) days' advance written notice of its desire to terminate.

Notwithstanding the immediately preceding paragraph, in the event of a breach in the performance of this Agreement by either party and following written notice to the breaching party and failure to correct to the satisfaction of the non-breaching party within thirty (30) days of the giving of said notice, the non-breaching, in addition to all other remedies afforded to it by law, may declare this Agreement immediately terminated for cause. The filing of any petition in bankruptcy by or against either party, the making of an assignment for the benefit of either parties creditors, the admitted inability to pay either parties debts as they become due or the appointment of a receiver, trustee or liquidator of either party, shall be deemed a material breach of this Agreement on the occurrence of which either party may, without notice to or opportunity to correct by either party, declare this Agreement immediately terminated for cause. Notwithstanding anything contained in this Agreement to the contrary, upon the expiration of the Agreement either at the end of the initial term or any succeeding term or the earlier termination of this Agreement, the parties agree that the following shall survive such expiration or termination: (i) all representations, warranties and/or guarantees made by either party hereunder; (ii) the provisions of Paragraph 7; and (iii) Paragraph 13.

9.    **ASSIGNMENT:** Seller acknowledges that the services to be rendered by it to CHR are unique. CHR acknowledges that Seller will use the services of its suppliers and/or shippers to provide some of the services under this Agreement. However, Seller agrees that it remains responsible to CHR for the performance of this Agreement. Accordingly, Seller may not assign its rights or delegate its duties or obligations under this Agreement to another party without the prior written consent of CHR.

10.    **FORCE MAJEURE:** If either party hereto is prevented from complying, either totally or in part, with any of the terms or provisions of this Agreement, by reason of fire, flood, storm, crop failure, strike, lockout or other labor trouble, riot, war, terrorist act, rebellion, accidents, acts of God, and/or any other cause or casualty beyond the reasonable control of the party prevented from complying ("Force Majeure Event"), then upon written notice to the other party, the requirements of this Agreement are subject to the provisions as may be affected, and to the extent so

Seller Initials: _____

affected, shall be suspended during the period of such Force Majeure Event; provided, however, that the party prevented from complying shall make all reasonable effort to remove or work around such Force Majeure Event as soon as possible. Failure to do this shall constitute grounds for the termination of this Agreement by the other party. During such period, the party not prevented from complying as aforesaid may seek to have its needs (which would otherwise be met hereunder) met by or through others without liability hereunder.

**11.   ENTIRE AGREEMENT; AMENDMENT:** This Agreement, together with its Exhibits and any underlying Orders, including any C.H. Robinson CPDS Produce Agreement documents entered into between CHR and Seller during the term of this Agreement, constitutes the entire agreement and understanding between the parties regarding the subject matter set forth herein, and merges all prior discussions, understandings, and agreements between the parties with respect to the said subject matter. Seller, as evidenced by its initialing each page and signing of the Agreement, acknowledges that it has read, understand, and agrees to the terms and conditions set forth in the Agreement This Agreement may not be amended except in writing duly executed by authorized representatives of the parties or by Seller's invoice or confirmation not promptly objected to by CHR.

**12.   NOTICE:** Any demand or notice which either party desires or may under the provisions of this Agreement be required to make upon or give to the other party shall be deemed properly given or made if in writing and deposited in a United States post office, certified or registered mail, postage prepaid, bearing the address of the respective parties set forth below:

When to CHR:
 C.H. Robinson Company
 Attn M Castagnetto
 14701 Charlson Road - Suite 900
 Eden Prairie, MN 55347-7747
With copy to:
 C.H. Robinson Company
 Legal Department
 14701 Charlson Road - Suite 900
 Eden Prairie, MN 55347-7747
 Facsimile: 952-937-7840

Either party may redesignate its representative to receive notices hereunder and/or change its address by giving written notice of such redesignation and/or change to the other party.

**13.   PRODUCT RECALL:** If it is determined that there has been actual quality or other defect in any Product provided by Seller to CHR under this Agreement, including Product utilizing Licensed Materials, CHR shall have the right to determine the corrective action required to be completed by Seller. Such corrective action shall be at Seller's and/or CHR's expense as agreed at the time, including but not limited to the necessity for a Product retrieval.

**14.   MISCELLANEOUS:**
14.1   Applicable Law: This Agreement shall be construed in accordance with the laws of the State of Minnesota.
14.2   Headings: The headings contained in this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.
14.3   Dispute Resolution: Any dispute between the parties arising out of or in connection with this Agreement or any alleged breach hereof shall be subject to the following provisions:

14.3.1   Any such dispute may, at the option of either party, first be submitted for discussion and possible resolution by senior officers of CHR and Seller, as designated by their respective chief executive officers. If either party elects to have the dispute so submitted, the other party agrees to designate senior officers to participate in such discussion.

14.3.2   If either (i) neither party has elected to submit a dispute for discussion in accordance with Section 14.3.1 within thirty (30) days after both parties have been notified of such dispute, or (ii) within a period of thirty (30) days after submission of a matter in accordance with Section 14.3.1, the respective senior officers are unable to agree upon a resolution of such dispute, either party may, within thirty (30) days following the applicable aforesaid 30-day period, elect to utilize a non-binding resolution procedure whereby each party presents its case at a hearing held in Minneapolis, Minnesota before a panel consisting of a senior executive officer of each party and a mutually acceptable neutral advisor, who shall be selected from the CPR Institute for Dispute Resolution's Panels of Distinguished Neutrals. If so elected, the parties shall bear their respective costs incurred in connection with this procedure, including

Seller Initials: _____

CONFIDENTIAL

CHR00022

the fees and expenses of the neutral advisor. Prior to the hearing, the parties and the neutral advisor shall use their best efforts to agree on a set of ground rules for the hearing. At the conclusion of the hearing, the senior executive officers of the respective parties shall meet and attempt to resolve the matter. If the matter cannot be resolved at such meeting, the neutral advisor may be called upon to render his or her opinion as to how the matter would be resolved had the matter been on trial in a court of law. After the opinion is received, the executives shall meet again and try to resolve the matter. If the matter cannot be resolved at such meeting, any party may give the other party notice of its intention to litigate.

14.3.3  No litigation may be commenced hereunder concerning a matter in dispute until the later of (i) the 60th day following the date on which the litigating party has provided notice to the other party of such dispute (assuming that neither party has

then elected to submit a dispute for discussion in accordance with the preceding clauses 14.3.1 or 14.3.2 or (ii) the 90th day following any sending of notice to utilize the non-binding resolution procedures specified in Section 14.3.2, (such sixty (60) or ninety (90) day period, as applicable, being referred to herein as the "Cooling Off Period"); provided, however, that such litigation may be commenced prior to completion of the Cooling Off Period if (a) the applicable statute of limitations would run prior thereto or (b) the party requires immediate equitable relief. Only after the foregoing procedure has been exhausted shall either party resort to litigation as the final adjudication of the dispute.

14.3.4  All negotiations pursuant to the preceding clauses 14.3.1 or 14.3.2 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized respective corporate officers.

C.H. ROBINSON COMPANY

By: _____
Jim Lemke

Title:  President, Robinson Fresh

Date: _____7-22-2015_____

UPALA AGRICOLA

By: _____

Title: _____

Date: _____JULY-22-2015_____

Seller Initials: _____

CONFIDENTIAL

CHR00023

**Exhibit A**
**Food Safety Program Schedule**

This Exhibit A Food Safety Program Schedule identifies the requirements Seller must meet with regard to all Product provided to CHR under the Agreement.

1.  Good Agricultural Practices (GAPs): Seller shall develop and maintain effective GAPs which will ensure that areas where contamination can occur during the growing and harvesting phase of production of the Product are identified and that appropriate and effective preventative measures are taken. All GAPs shall, at a minimum, follow and comply with the guidelines set fort and identified at http://www.cfsan.fda.gov/~dms/prodguid.html.

2.  Good Manufacturing Practices (GMPs): If Seller utilizes any type of storage, cold storage, cross-docking, warehouse, packing, or other facility in which it or its growers manufactures, processes, packs, transports, distributes, receives, or holds Product sourced to CHR under this Agreement ("Facility"), Seller shall develop and maintain a GMP which will ensure that areas where contamination can occur within the Facility are identified and that appropriate and effective Facility contamination preventative measures are taken. All GMPs shall follow and comply with the guidelines set forth and identified at http://www.cfsan.fda.gov/~lrd/cfr110.html.

3.  Pesticide Residue Tolerances: Seller shall develop and maintain procedures which establish and continually identify relevant control points in the production of the Product to ensure pesticide residue tolerances do not exceed the Maximum Residue Level (MRL) of the U.S. Environmental Protection Agency approved pesticides. Seller's processes shall not allow shipment of Product to CHR if the established MRL was exceeded. Seller's pesticide tolerance records shall be maintained for a period of two (2) years from their creation and CHR may review all such records and/or conduct additional testing at any time.

4.  Trace Back / Recall Program: Seller shall comply with the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, in addition to any federal regulations applicable to entities working with food items requiring the ability to trace back and recall any food item to the place of production. Seller must develop and maintain standard operating procedures which ensure that an effective trace back and recall system is in place. It is recommended that a mock trace back and recall exercise be performed at least once a year.

5.  Annual Food Safety Audits: Seller shall conduct, through an approved third party auditor such as Scientific Certification Systems (SCS), Primus, Davis Fresh, BRC, NSF Cook & Thurber, Guelp or Silliker ("Approved Third Party Auditor") annual GMP audits ("Audits"). Seller must disclose to CHR all Facilities they intend to use in order to source branded and/or non-branded Product to CHR so the appropriate Audit can be performed. Any Seller Facility that is not disclosed will not be allowed to source, directly or indirectly, Product to CHR. Seller's GMP Audit scores, as measured by the Approved Third Party Auditor, must be 80% or better to continue to source branded and/or non-branded Product to CHR. Copies of all Audits must be provided by Seller to either CHR or Primus for review, analysis, and retention.

6.  If Seller violates the terms of this Exhibit A, CHR shall not be restricted to the limitation of liability set forth in Section 7.4 of the Agreement for the recovery of any damages resulting from such a breach.

[END OF EXHIBIT A]

Seller Initials: _____

CONFIDENTIAL

CHR00024

**Exhibit B**
**Licensed Materials Schedule**

If CHR and Seller mutually agree, as set forth in an Order, that the Licensed Materials shall be used and associated with the Product, CHR shall license the Licensed Materials to Seller and Seller shall use the Licensed Materials solely in compliance with the terms set forth in the Agreement and this Exhibit B.

1.      All Licensed Material used by Seller must be created by Seller in accordance with this Agreement, this Exhibit B, and any additional written instructions (including but not limited to e-mail and facsimile) issued by CHR to Seller relating to the Licensed Materials. Additionally, all Licensed Material must be approved for use by CHR prior to Product shipment by Seller. If CHR (or CHR's representatives) provides Seller with Licensed Materials, Seller may not alter, modify, or change the Licensed Material without the prior written consent of CHR. Seller shall ensure the accuracy of all text accompanying the Licensed Material which is associated with or required to be provided regarding the Product, including but not limited to all required weights, measures, regional markings, contents, nutritional panels, and health claims.

2.      In creating the Licensed Materials, Seller shall obtain containers and packaging materials from reputable suppliers. CHR shall provide Seller with all required packaging artwork making up the Licensed Materials. All Licensed Materials shall, at all times be deemed to be the property of CHR.

3.      Seller represents, warrants, and agrees that it shall not use the Licensed Material in any other manner except as authorized under this Agreement. In no instance will any Licensed Material be sold, assigned, transferred or given to third parties or otherwise disposed of without the prior written consent of CHR.

4.      The parties expressly agree and understand that no right, title, license, or interest of any kind or nature in the Licensed Materials is granted or conveyed to Seller under this Agreement except those specific rights granted to Seller under this Agreement. It is agreed and understood that Seller shall have the right to assign and/or transfer to its suppliers and shippers its obligations to package Product, and Seller may sell, assign, transfer or give labels and packaging materials to its suppliers and shippers in order to meet Seller's obligations under this Agreement. If Seller assigns, sells or otherwise transfers its obligations under this Agreement to any supplier or shipper, including the transfer of any Licensed Materials, Seller assumes the same liability and responsibility for such suppliers' and/or shippers' conduct and performance of such obligation as though Seller had performed and/or fulfilled such obligations itself. Seller shall contractually require all such suppliers and/or shippers to comply with all of the terms of this Agreement, including but not limited to the confidentiality and Food Safety Program requirements. CHR shall in no instance incur any additional fees, costs or liability with regard to any effort sold, assigned, or transferred by Seller.

5.      The Parties expressly agree and understand that CHR has the full right and title in and/or has the right to use the Licensed Material in connection with the Product, and Seller agrees not to contest or deny the validity, right or title of CHR in or to the Licensed Material, and Seller shall not encourage or assist any other third party, directly or indirectly, in doing the same, during the term of this Agreement or thereafter in perpetuity.

6.      Seller agrees to maintain or cause its suppliers and/or shippers to maintain at all times hereunder a ninety-(90) day inventory of printed packaging supplies to be used as part of the Licensed Materials for the Product. In the event CHR elects to redesign any portion of the Licensed Material, it shall provide ninety-(90) day's written notice of such design change to Seller, such notice to include the revisions to the Licensed Material as well as such other materials as Seller may reasonably require in order to implement the change. Seller's required inventory level shall be determined by identifying the actual packaging supplies used during the same ninety-(90) day period from the preceding year and/or based upon written projections provided by CHR.

7.      Upon termination of this Agreement, whether with or without cause, Seller shall hold for prompt return to CHR (1) all Licensed Material used in connection with or respect to Seller's manufacture of labels to be affixed to Product packaging and (2) all remaining inventory of such packaging or otherwise dispose of the same in accordance with CHR directions. CHR may take all necessary actions to recover its property including entry upon Seller's premises and directing repossession and removal and/or destruction of CHR property.

Seller Initials: _____

CHR00025

8.    If Seller violates the terms of this Exhibit B, CHR shall not be restricted to the limitation of liability set forth in Section 7.4 of the Agreement for the recovery of any damages resulting from such a breach.

9.    CHR shall indemnify Seller and holds Seller harmless from and against all claims or actions alleging trademark infringement based upon Seller's authorized use of the trademarks under which the Product is packages pursuant to this Agreement and agrees to defend or settle such claims or actions at CHR's sole expense provided Seller gives CHR prompt notice of such claims or actions and cooperates fully with CHR in defending the same. CHR shall, in its sole discretion, approve any terms related to the settlement of any such infringement claims. CHR reserves the right to fully control the handling of any such claims or actions regardless whether litigation has been commenced.

10.    Seller shall promptly, but in no instance later than thirty (30) days after receiving notice thereof, notify CHR of the alleged infringement claims against Seller and, if appropriate, CHR shall become a party defendant in such proceedings. Failure by Seller to furnish such notice within said thirty (30) days period shall relieve CHR of its obligations hereunder. Seller agrees to cooperate fully with CHR in defending any claims under Section 7.1, at CHR expense.

11.    Seller shall not utilize any Licensed Materials designated for use with or as Organic on any Products that are not Organic.

[END OF EXHIBIT B]

Seller Initials: _____

CONFIDENTIAL

CHR00026

EXHIBIT "3"

CHR00048



## CERTIFICATE OF SERVICE

I, Arthur L. Bugay, Esquire, certify that service of the original of the within Plaintiffs' First Amended Complaint, was served upon counsel below via hand delivery to the Court and e-mail to counsel as follows:

Sean S. Litz, Esquire
Royer Cooper Cohen Braunfeld, LLC
Two Logan Square, Suite 710
Philadelphia, PA 19103

Charles P. Neely, Esquire
Palmer Biezup & Henderson
190 N. Independence Mall W., Suite 401
Philadelphia, PA 19106

Timothy Rau, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
2000 Market Street, 23rd Fl.
Philadelphia, PA  19103

Lynne Kessler Lecther, Esquire
1845 Walnut Street, 25th Floor
Philadelphia, Pennsylvania 19103

GALFAND BERGER, LLP

BY:_____
ARTHUR L. BUGAY, ESQUIRE
Attorney for Plaintiff

DATE: 7/3/19